**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NASHEEN ANDERSON, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, *et al.*, | : | NO. 11-6318 |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S. J.                                                                          August 8, 2012

Presently before the Court is the Summary Judgment Motion of Defendant Police Officers

James Connell, Chris Fuentez, Jhonathan Lackey, Maribelle Quiles, and Edward Wright of the

Philadelphia Police Department.[1]  For the following reasons, the Motion is granted in part and denied

in part.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This matter arises out of the alleged false arrest and use of excessive force on Plaintiff

Anderson by officers of the Philadelphia Police Department.  At the time of the underlying action,

---

[1] In Plaintiff's Complaint, Police Officers Robert Hoover and Obie Hazzard are also
listed as Defendants to this action.  In the instant Motion for Summary Judgment, however,
Defendants do not include either Officer Hoover or Officer Hazzard as one of the moving
officers. As such, the Court will presume that Defendants do not seek summary judgment on
Plaintiff's claims as applied to either of these officers, and all claims against Officers Hoover and
Hazzard shall therefore proceed to trial.

Furthermore, Plaintiff likewise asserts claims against Officers Edwin Lugo and Chris
Dougherty in his Complaint, and Defendants move for summary judgment on all claims asserted
against both officers.  In his Response in Opposition, however, Plaintiff withdraws his claims
against Officers Lugo and Dougherty.  As such, summary judgment is granted in favor of
Officers Lugo and Doughtery on all claims asserted against them, and they are no longer included
as Defendants in the instant action.

Plaintiff was a thirteen-year-old middle school student that resided with his mother in Southwest Philadelphia.  (Defs.' Mot. Summ. J., Ex. A1, Dep. of Nasheen Anderson ("Anderson Dep.") 10:13–15; Pl.'s Resp. Opp'n, Ex. 1, Pl.'s Statement of Uncontested Facts, at 1 n.2.)  The Defendant Officers are police officers in the Philadelphia Police Department's 12th District in Southwest Philadelphia.

At approximately 9:17 p.m. on June 1, 2010, an announcement was made over the Philadelphia Police radio network informing officers to report to the scene of gunshots fired near the intersection of Greenway Avenue and Gould Street in Southwest Philadelphia.  (See Defs.' Mot. Summ. J., Ex. 12, Dispatcher Incident History Summary ("Dispatch Log").)  At this same time, Plaintiff Anderson was outside playing with his friends at the same intersection.  (Anderson Dep. 37:12–13; Defs.' Mot. Summ. J., Ex. J1, Statement of Nasheem Anderson ("Anderson Statement"), at 1.)  At this point, the parties' stories diverge.  According to Plaintiff, during friendly horseplay with his friends, a young boy named Reef/Reif[2] began to chase him down Gould Street.  (Anderson Dep. 40:6–24.)  Anderson avers that, at some unknown point during the chase, he turned to discover that Reif was no longer chasing him.  (Id. at 41:15–18.)  Rather, he was being pursued by a police officer.  (Id. at 41:19–20.)

 According to Officers Fuentez and Lackey, they were together in their patrol car when the gunshots report came through.  (See Pl.'s Resp. Opp'n, Ex. J, Dep. of Christopher Fuentez ("Fuentez Dep.") 7:8–16; Pl.'s Resp. Opp'n, Ex. L, Dep. of Jhonathan Lackey ("Lackey Dep.") 16:3–4.)  As the two approached the corner of Greenway and Gould, they witnessed Anderson take off running.

---

[2] Throughout the record, this individual is referred to as both "Reef" and "Reif."  For purposes of clarity, the Court solely refers to this individual hereinafter as "Reif."

2

(Fuentez Dep. 16:5–6; Lackey Dep. 22:1.)  Suspecting him of being the shooter, Officer Lackey pursued him on foot.  (Fuentez Dep. 16:7–8, 19:3–11; Lackey Dep. 27:14–17, 28:15–16, 29:8–14.) Officer Fuentez then broadcast over the police radio that his partner was in foot pursuit of a suspect of the shooting.  (Fuentez Dep. 18:15–17.)  Officers Wright and Quiles, who heard the radio reports, arrived at the corner shortly thereafter.  (Pl.'s Resp. Opp'n, Ex. I, Dep. of Edward Wright ("Wright Dep.") 11:12–24; Pl.'s Resp. Opp'n, Ex. E, Dep. of Maribell Quiles ("Quiles Dep.") 12:20–24.) Upon their arrival, Officer Fuentez instructed them to assist Officer Lackey in his foot pursuit of Anderson.  (Wright Dep. 14:21–24; Quiles Dep. 21:7–10.)

During the chase, Anderson and Officer Lackey ran past another group of nearby police officers that included Officer Hoover.  (Lackey Dep. 32:2–4.)  Officer Hoover thereafter joined in the chase.  (Id. at  41:1–24; Defs.' Mot. Summ. J., Ex. G1, Statement of P/O Maribelle Quiles ("Quiles Statement") at 1.)  At this point, Officer Lackey slowed his pace to catch his breath and lost sight of Anderson and Officer Hoover.  (Lackey Dep. 42:4–5.)  During the chase, Officer Hoover allegedly drew his gun and yelled at Anderson to "put your f___ hands up" and "don't f____ move." (Anderson Dep. 49:1–15; Anderson Statement at 1; Compl. ¶ 19.)  Anderson complied, and turned to face the officer.  (Anderson Dep. 50:13–14.)  Officer Hoover then allegedly grabbed Anderson by the neck, forcibly turned him around, pushed him into a nearby iron railing, and hit him over the head with the end of his gun.  (Id. at 50:13–24, 51:20–24, 55:1–9, 56:21–23, 57:1–24, 58:5–10, 59:2–24, 60:1–18, 61:1–24, 62:1–24.)  When Anderson tried to tell Officer Hoover that he had not been running away from him, Hoover apparently responded by punching Plaintiff in the ribs several times and pressing his head into the iron railing.  (Id. at 56:21–23, 57:14–16, 59:11–22.)  According to the record, Officers Hazzard and Connell were also present during this alleged encounter.  (Defs.'

3

Mot. Summ. J., Statement of P/O Edward Wright ("Wright Statement") at 2.)  While he was being assaulted, Anderson heard one of the other officers instruct Officer Hoover to "put him down," to which Hoover responded by lifting him by the hood of his sweatshirt and slamming him to the ground.  (Id. at 2–3; Anderson Dep. 65:9–24.)  While laying on the ground, Officer Hoover and other unidentified police officers proceeded to kick and beat him, and scrape his face along the rough sidewalk.  (Id. at 67:2–24, 68:1–24.)  At some point, Anderson was lifted off the ground and handcuffed.  (Anderson Statement at 1.)  An officer then frisked Anderson, during which time he pulled down his pants and unzipped his sweatshirt.  (Id. at 2; Compl. ¶ 34.)  When Anderson allegedly asked the officer to pull his pants back up, he was told to "shut up."  (Id. ¶ 35; Anderson Statement at 2.)  Officer Connell, the supervising officer in charge, then allegedly approached Anderson and asked him, "what the f___ were you running for?" (Anderson Dep. 77:6–14.)  Officer Connell thereafter proceeded to racially insult him.  (Id. at 77:16–20.)  Anderson was then shoved into the back of a police vehicle operated by Officer Fuentez, and Officers Fuentez and Lackey were instructed to transport him to the 12th District police headquarters for further investigation.  (Fuentez Dep. 33:17–19, 36:4–6; Lackey Dep. 57:6–17.)

Once at the police station, Officer Fuentez parked in a small lot adjoining the station.  (Anderson Dep.80:1–24.)  Anderson was not removed from the vehicle immediately, but rather remained handcuffed inside while Officer Fuentez consumed a small pizza.  (Id. at 81:4–24, 82:10–17; Anderson Statement at 2.)  At this same time, Plaintiff's mother, Hope Anderson, called the police station in search of her son based on information she had received from his friends.  (Compl. ¶ 46.)  She was allegedly told that her son was not there, and her request to speak to a supervising officer was denied.  (Id. ¶ 48.)

4

Shortly thereafter, Officer Connell came out of the station and asked whether the other officers found any drugs or weapons on Anderson's person, to which they responded that they had not.  (Anderson Dep. 82:19–21, 83:1–19.)  When Connell discovered that Anderson was only thirteen-years-old, he allegedly became angry, and directed the other officers to release him.  (Id. at 83:21–24, 84:1–7.)  According to Plaintiff, despite Officer Connell's instruction, he was not immediately released, but rather remained in the police vehicle while Officer Fuentez finished eating his pizza.  (Id. at 84:8–17.)  Fuentez then proceeded to ask Plaintiff several questions prior to releasing him from the vehicle and removing his handcuffs.  (Id. at 84:22–24, 85:1–23.)  As Anderson exited the parking lot, other police officers apparently made snide comments to him.  (Id. at 87:10–17.)  Plaintiff estimates that he was detained in the police vehicle for approximately fifteen minutes.  (Id. at 87:8.)  He was never charged with any violation of the law during his encounter with the police.  (Compl. ¶ 60.)

Plaintiff thereafter walked to his friend's nearby house and contacted his parents.  (Anderson Dep. 88:1–12.)  His parents photographed his wounds and filed a complaint with a different Police District.  (Id. at 92:1–24.)  Anderson was then taken to the Children's Hospital of Philadelphia, where he was treated and held overnight for observation.  (Id. at 93:1–3; Pl.'s Resp. Opp'n, Ex. C, Child. Hosp. of Phila. Records ("CHOP Med. Records").)  Social services at the hospital contacted the 12th District Police Department, but received no response.  (Id.)  Plaintiff subsequently filed a citizen's complaint with the Internal Affairs Division ("IAD") of the Philadelphia Police Department. (Anderson Dep. 93:5–7, 95:19–22, 96:4–24.)  Anderson and his family heard nothing from IAD for over a year, at which time they received a notice that their complaint could not be "sustained" because of a lack of "independent officers and denials by the informed officers."

5

(Compl. ¶ 59.)

Plaintiff filed the instant civil rights action in federal court on October 7, 2011, alleging that Defendants violated his rights under the United States Constitution pursuant to 42 U.S.C. § 1983. Although not relevant to the instant Motion, Plaintiff also brings state law claims for assault and battery against the Defendant police officers.  Defendants filed the instant Motion for Summary Judgment on June 8, 2012, and Plaintiff responded in opposition on June 25, 2012.  In his Response in Opposition, Plaintiff withdrew his specific claims against Officer Fuentez for state law assault and battery, use of excessive force, and failure to intervene in the excessive force used by other officers.[3] On July 9, 2012, the parties entered into a stipulation—which the Court signed and approved—that all counts against the City of Philadelphia and Officers Dougherty and Lugo would be dropped and that these parties would be dismissed as defendants.  As such, the Court presently considers whether the remaining Defendants in this action are entitled to summary judgment on their claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide

---

[3]  As such, summary judgment is granted in Officer Fuentez's favor on the excessive force and state law assault and battery claims asserted against him.  Plaintiff's false arrest claim against Officer Fuentez, however, shall proceed to trial.

which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative."  Id. at 249–50 (citations omitted).

## III.   DISCUSSION

Plaintiff avers that the Defendant police officers in this action violated his constitutional rights by falsely arresting and using excessive force on him.  In the instant Motion, Defendants allege

that they are entitled to qualified immunity on Plaintiff's false arrest claim.  Defendants also move for summary judgment on the basis that Anderson cannot show that Officers Fuentez, Lackey, Quiles, and Wright "failed to intervene" to stop the alleged excessive force, and that Officer Connell, as the supervising officer in charge, cannot be held liable under a "failure to supervise" theory. Because the qualified immunity doctrine serves as an affirmative defense, the Third Circuit has cautioned the district courts to "resolve any immunity question at the earliest possible stage of any litigation[.]"  See Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995); Crawford-El v. Britton, 523 U.S. 574, 587 (1998) ("[Q]ualified immunity is an affirmative defense[.]").  The Court therefore first considers Defendants' qualified immunity defense in relation to Plaintiff's false arrest allegation, and then assesses whether Defendants are entitled to summary judgment on the remainder of Plaintiff's claims.

A.    **The Qualified Immunity Doctrine[4]**

Qualified immunity exists when a reasonable officer could have believed his conduct was lawful in light of clearly established law.  Moreover, the plaintiff's subjective beliefs are irrelevant in determining whether the qualified immunity doctrine applies.  See Anderson v. Creighton, 483 U.S. 635, 636 (1987); Green v. City of Patterson, 971 F. Supp. 891, 901 (D.N.J. 1997).  The doctrine provides sufficient room for mistakes in the officers' judgment, and serves to protect "all but the plainly incompetent or those who knowingly violate the law."  Green, 971 F. Supp. at 901 (quoting Orsatti, 71 F.3d at 484) (further citations omitted).  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court established the standard for invoking a qualified immunity defense, stating that:

_____

[4] Defendants only raise the qualified immunity defense with regard to Plaintiff's false arrest claim.  As such, the Court will not address whether the officers are entitled to qualified immunity for Plaintiff's excessive force claim.

"government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Id. at 818 (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Court refined this standard by formulating a two-pronged inquiry into the officer's conduct: (1) whether, taken in the light most favorable to the plaintiff, the alleged facts indicate the deprivation of an actual constitutional right; and (2) if so, whether the right was clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  Id. at 201, overruled in part on other grounds; see also Holmes v. Cnty. of Del., No. Civ.A.04-4794, 2007 WL 954122, at *4 (E.D. Pa. Mar. 28, 2007); Pagan v. Ogden, No. Civ.A.09-00002, 2010 WL 3058132, at *6 (E.D. Pa. July 30, 2010);  Bergdoll v. City of York, No. Civ.A.1:08-01879, 2009 WL 25093, at *7–8 (M.D. Pa. Jan. 5, 2009).  In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that the sequence of the Saucier inquiry is not mandatory, and that district courts should exercise their "sound discretion" in determining which prong to address first.  Id. at 236; see also Pagan, 2010 WL 3058132, at *6; Verdier v. Borough, 796 F. Supp. 2d 606, 630 (E.D. Pa. 2011).

The first prong of Saucier instructs the Court to consider whether the facts alleged by Plaintiff indicate that the officers' conduct violated a constitutional right.  Saucier, 533 U.S. at 201. Anderson contends that the Defendant police officers violated his Fourth Amendment rights to be free from unreasonable search and seizure and to be secure in his person when they falsely arrested him.  (Compl. ¶ 79; Pl.'s Resp. Opp'n 11.)  In response, Defendants assert that they are entitled to qualified immunity on Plaintiff's false arrest claim because they had probable cause to arrest him, and therefore no constitutional violation occurred.  (Defs.' Mot. Summ. J. 18.)  More specifically,

Defendants allege that probable cause existed for Anderson's arrest because he was seen running from the street corner where fired gunshots had just been reported, and they therefore "were not in a position to know whether Plaintiff was involved [in] any gun incident, or whether he had potentially discarded any contraband material while running." (Id. at 19.)

Broadly stated, the Fourth Amendment[5] prohibits the unreasonable seizure of a person absent a judicially-sanctioned warrant supported by probable cause.[6]  See Orsatti, 71 F.3d at 482.  "A seizure of the person within the meaning of the Fourth [ ] Amendment[] occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991); Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  The Supreme Court has articulated numerous examples of circumstances that constitute a "seizure" within the context of the Fourth Amendment, including: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Kaupp, 538 U.S. at 630 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

All official seizures of a person, such as a formal arrest, must be supported by probable

---

[5] "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons . . . to be seized."  U.S. Const. amend. IV.

[6] The Fourth Amendment is made applicable to the states through the Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 272–73 (1994) (citing Mapp v. Ohio, 367 U.S. 643 (1961)) (further citation omitted).

cause.  See Michigan v. Summers, 452 U.S. 692, 696 (1981) (citing Dunaway v. New York, 442

U.S. 200, 207 (1979)).  The law is clear that an individual can bring a § 1983 claim for false arrest

when probable cause is absent to form the basis of an arrest.  See Criss v. Crossgrove, No. Civ.A.04-

2244, 2007 WL 542228, at *7 (D.N.J. Feb. 16, 2007) (citing Ramirez v. United States, 998 F. Supp.

425, 430 (D.N.J. 1998)).  "Therefore, a defense to a false arrest claim is the establishment of

probable cause."  Criss, 2007 WL 542228, at *7 (citing Dowling v. City of Phila., 855 F.2d 136, 141

(3d Cir. 1988).  The Supreme Court has indicated that probable cause exists when, considering the

totality of the circumstances, "the facts and circumstances within the officer's knowledge were

sufficient to warrant a prudent man in believing a crime had been committed."  Hunter v. Bryant, 502

U.S. 224, 228 (1991); see also Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

       In this case, there are simply too many unsettled facts surrounding Anderson's encounter with

the police officers of the 12th District in order for the Court to definitively decide whether any

officer—or all the Defendant police officers for that matter—actually violated Anderson's

constitutional rights under the Fourth Amendment.  As an initial matter, the Court is unable to glean

from the record at which point Anderson was "seized" such that he could be deemed falsely arrested

in violation of the Fourth Amendment.  Anderson was certainly under arrest—and therefore seized

within the meaning of the Fourth Amendment—at the time that he was captured, detained, and

handcuffed by Officer Hoover.  See Torres v. McLaughlin, 163 F.3d 169, 174 (3d Cir. 1998) (citing

Terry v. Ohio, 392 U.S. 1, 19 (1968)) ("It is beyond dispute that the Fourth Amendment has been

construed to include events both before and after a formal arrest.") (further citation omitted).

Whether Anderson was "arrested" during the initial police pursuit such that the other named police

officers can be held liable, however, remains in genuine dispute.

11

In Michigan v. Chesternut, 486 U.S. 567 (1988), the Supreme Court recognized that a chase by police officers does not necessarily constitute a seizure of the person. Id. at 575. In that case, police officers in a marked car witnessed the defendant approach another man standing alone on a corner in a high-crime area. Id. at 569. Upon seeing the patrol car, the defendant turned and began to run. Id. The police responded by pursuing him in their vehicle. Id. As they drove up alongside the defendant, the officers witnessed him discard a number of pill packets from his pocket. Id. An officer then exited the vehicle, identified the pills as controlled substances, and arrested the defendant for the possession of narcotics. Id. The issue before the Supreme Court was whether the defendant had been "seized" during the chase prior to his formal arrest such that probable cause was necessary. Id. at 574. The Court found that the defendant was not seized at this time because "the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement." Id. at 575. In so finding, the Court noted that the officers did not activate their siren or flashers, draw their weapons, command the defendant to stop, or block his path with their vehicle. Id. The Court further noted that the officers' intended goal of the chase was not to capture the defendant, but rather to determine where he was going. Id. at 576 n.7. The Court recognized that, "[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of [ ] presence does not, standing alone, constitute a seizure" of the person necessitating probable cause. Id. at 576 (internal citations and quotation marks omitted).

Chesternut, however, is distinguishable from the instant case. Here, Anderson was actively pursued on foot by several police officers. Such a zealous pursuit could certainly have communicated to Anderson that he was not free to ignore the officers chasing him and go about his

own business.  Moreover, unlike Chesternut, the record here indicates that the goal of Anderson's

pursuit was to detain and investigate him, and not just to ascertain which direction he was headed.

Officer Lackey, in fact, admitted as much in his deposition:

> Q:     So you chased him?
> A:     Yes.
> Q:     And what were you going to do?
> A:     Stop him.
> Q:     Physically grab him, stop him?
> A:     Yes.

(Lackey Dep. 29:6–11.)  Furthermore, in contrast to the factual scenario in Chesternut, it is unclear

from the record whether, at some point during the chase, Anderson was commanded to stop, a police

vehicle blocked his path, or an officer drew a weapon on him.   (Quiles Dep. 28:14–24,

32:7–24,36:2–4, Lackey Dep. 37:15–18; Wright Dep. 16:1–4.)  At his deposition, Anderson testified

that these events occurred, but was unable to identify which officer chased him, yelled for him to

stop, or drew his gun.  (Anderson Dep. 48:2–24, 49:1–24.)

Moreover, the circumstances surrounding the actual chase remain in significant dispute.

According to Officer Fuentez, Anderson and several other individuals took off running when police

approached the corner in question.  (Fuentez Dep. 14:19–21,16:5–21.)  Officer Lackey testified that,

upon his and Officer Fuentez's arrival at the corner, Officers Wright and Quiles were already there

questioning a group of young black males, and Anderson alone took off running at this time.

(Lackey Dep. 18:15–24, 19:1–2, 22:1.)  According to Lackey, at this point one of the officers yelled

for someone to stop Anderson, and he therefore began to chase him. (Id. at 27:16–17, 28:15–16.)

Officers Wright and Quiles, however, stated that Officer Lackey was already in pursuit of Anderson

upon their arrival at the corner, and Officer Fuentez instructed them to assist in the pursuit.  (Wright

Dep. 14:18–24, 15:1–5; Quiles Dep. 19:12–17, 20:4–15.)  Anderson, on the other hand, testified that he took off running prior to the arrival of any police officer at the corner because his friend Reif was playfully chasing him, and that at some point he turned to discover a police officer pursuing him. (Anderson Dep. 41:21–24, 42:1–17.)  As such, given this contradictory evidence in the record, the Court cannot conclusively determine whether Defendants violated Anderson's constitutional rights in this situation.

The record here also shows that the officers' own accounts of the foot pursuit differ from each other.  For example, Officer Wright testified that he and his partner, Officer Quiles, attempted to pursue Anderson in their vehicle upon learning of Officer Lackey's foot chase, but never actually saw him running.   (Wright Dep. 14:5–7.)  He also stated that, by the time he and Officer Quiles caught up to the other officers, Anderson had already been apprehended.  (Id. at 16:1–15.)  Officer Quiles, however, testified that she and Officer Wright actually witnessed Anderson running from the other officers, and they therefore turned on their domelights and sirens and stopped their cruiser in the middle of the street in an attempt to detain him.  (Quiles Dep. 26:8–11, 28:12–24, 29:1–10.) Officer Quiles further testified that both she and Officer Wright also partook in the foot pursuit of Anderson, and that at some point they, along with three other officers, "cornered" him against a wall prior to his formal arrest.  (Id. at 28:14–24, 29:1–10, 31:19–22, 38:1–24.)

It also remains unclear from the contradictory factual record at which point Officer Connell arrived at the scene such that he could be held liable for Anderson's alleged false arrest.  On his part, Officer Connell contends that he was not present during Plaintiff's arrest, and that he arrived at the scene after Anderson was already handcuffed and in the back of the police vehicle.  (Pl.'s Resp. Opp'n, Ex. D, Dep. of James Connell ("Connell Dep.") 38:3–21, 40:13–21.)  At his deposition,

14

Officer Connell clearly stated that: "I wasn't there for the apprehension, so I don't know where it occurred." (Id. at 61:2–3.) However, Anderson and Officers Wright, Lackey, and Quiles all recalled Connell being present at the scene.  (Anderson Dep. 76:12–24, 77:1–20; Wright Statement at 2; Lackey Dep. 49:21; Quiles Dep. 43:6–9, 44:5–16; Wright Dep. 17:13–20, 19:24, 27:15.)  In fact, contrary to Officer Connell's assertions, Officer Quiles testified to the following at her deposition:

> Q:  So at the scene of the apprehension, you were there, your partner was there, Connell was there . . . All of those guys were there?  You are sure of that?
> A:  Yes.

(Quiles Dep. 44:11–16.)  Similarly, in his formal Statement to IAD, Officer Wright definitively stated that: "I saw Sgt. Connell and P/O Hoover and P/O Hazard [sic] standing over the male." (Wright Statement at 2.)  Thus, depending on which version of the above facts is accepted, a juror could reasonably find that Anderson was unlawfully seized under these circumstances.  Such a disparity constitutes a genuine issue of material fact, and summary judgment on this point is therefore inappropriate.

Moreover, even if all the parties' recollections of the events in question aligned and Anderson was deemed "seized" for purposes of his false arrest claim, the Court would nonetheless be unable to grant summary judgment in Defendants' favor because it is unclear whether the police officers had probable cause to effectuate the seizure.  On this point, Defendants contend that they had probable cause to apprehend Anderson because he was witnessed running from an area where gunshots were recently fired, and that the police therefore reasonably suspected him of being the shooter.  It is well established within Supreme Court jurisprudence, however, that flight by itself cannot constitute probable cause to arrest.  See Wong Sun v. United States, 371 U.S. 471, 484 n.10 (1963); United States v. Cruz, 910 F.2d 1072, 1077 (3d Cir. 1990); United States v. Scott, 220 F. Supp. 2d 426, 429

(E.D. Pa. 2002).  Although subsequent courts applying Wong Sun and its progeny have held that flight coupled with other factors can equate to probable cause, see Cruz, 910 F.2d at 1077; United States v. Clark, 289 F. Supp. 610, 619 n.13 (D.C. Pa. 1968), the record here indicates that Defendants' sole proffered reason for Anderson's pursuit and eventual arrest was his flight from the scene of a crime.  Numerous officers acknowledged in their depositions that they merely pursued Anderson for this purpose, and lacked any further reason for his detainment.  For example, at his deposition, Officer Lackey testified as follows:

> Q:    And let me ask you, did any of the officers there on the scene, before you heard that "grab him," given you any information about the guy who ran?
> A:    No.
> Q:    Say anything about what he was doing, not doing, what he had said?
> A:    No.
> Q:    So you chased him?
> A:    Yes.
> Q:    And what were you going to do?
> A:    Stop him.
> . . .
> Q:    Why were you going to do that?
> A:    Because one of the other officers had informed me to grab him.
> Q:    That's the only reason you were going to grab him?
> A:    Yes.

(Lackey Dep. 28:23–24, 29:1–17.)  Similarly, at his deposition, Officer Fuentez testified that:

> Q:    Okay.  I believe you said you don't know why [Lackey] was chasing them?
> A:    Yeah, I don't know why he was chasing them.

(Fuentez Dep. 21:9–11.)  When pressed further on the issue of why Anderson was chased that night, Officer Fuentez further stated that:

> A:    I believe with the nature of the call [of reported gunshots at the scene.]  . . . [a]nd then upon people seeing police, for them to take off and run . . . It was definitely something that warranted investigation.
> . . .
> Q:    [Could it be] [f]air to say they may have been running for another reason?
> A:    It's possible, but . . .

16

(Id. at 25:16–21, 26:1–3.)  Similarly, when questioned in her deposition about Anderson's pursuit, Officer Quiles responded that she did not know why he was chased or arrested that night.  (Quiles Dep. 46:17–21.)  Officer Wright likewise acknowledged that, "I did ask what the foot pursuit was for and no one seemed to know any thing."  (Wright Statement at 2; Wright Dep. 20:13–24; 21:1–23.)  In fact, Officer Wright testified that no officer could provide him with any further information when he attempted to ascertain whether or not Anderson was carrying a gun.  (Id. at 40:12–16.)  As such, the evidence of record appears to indicate that Defendants' sole reason for pursuing and arresting Anderson was his flight from the corner where the gunshots were fired. Absent other factors, this reason is insufficient to constitute probable cause to arrest.

Given the above vast factual discrepancies, the Court is unable to ascertain at this point whether Anderson's constitutional rights were violated during his encounter with the Defendant police officers.  The Third Circuit has cautioned the district courts that "a decision on qualified immunity [can] be premature when there are unresolved disputes of historical fact which are relevant to the immunity analysis." Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).  The Court therefore finds that Officers Lackey, Fuentez, Connell, Wright, and Quiles cannot take advantage of the qualified immunity doctrine under these circumstances.  As such, Plaintiff's false arrest claim against them shall proceed to trial, and summary judgment on this point is accordingly denied.[7]

### B.     Excessive Force

Plaintiff also avers that Defendants violated his constitutional rights as a result of the

---

[7] Given that the first step of the Saucier qualified immunity analysis is not satisfied under these circumstances, the Court need not engage in an analysis of the second step, *i.e.* whether the alleged constitutional rights were clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.

excessive force that was allegedly used upon him.  Defendants respond that Plaintiff only identifies Officer Hoover as having potentially used physical force on him, and that the remaining officers therefore cannot be held liable for Hoover's actions. (Defs.' Mot. Summ. J. 16.)  Defendants further contend that, to the extent that Plaintiff attempts to hold them liable for their own *inaction* in failing to intervene to stop Officer Hoover's alleged use of excessive force, he has not adduced significant evidence to show that he can prevail on such a claim.  (Id.)  Defendants likewise assert that Officer Connell, as the supervising officer in charge, cannot be held liable for Officer Hoover's alleged use of excessive force under a failure to supervise theory of liability.  (Id. at 17.)  The Court considers each theory of liability and defense individually below.[8]

### 1.      Failure to Intervene

In Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002), the Third Circuit established that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, and, if the officer refuses to intervene, he can be held directly liable for the constitutional violation under § 1983.  See id. at 650.  In so establishing, the Third Circuit noted that:

---

[8] In his Complaint, Anderson asserts his claims against the Defendant officers in both their individual and official capacities.  (Compl. ¶¶ 4–14.)  "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  Hafer v. Melo, 502 U.S. 21, 25 (1991) (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985); Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)) (internal quotation marks omitted).  Suits against government officers in their official capacity therefore should be treated as suits against the government entity itself.  Hafer, 502 U.S. at 25 (citing Graham, 473 U.S. at 166).  To the extent that the officers in this case are being sued in their official capacities, the Court treats such actions as suits against the City itself.  As discussed above, however, the parties here entered into a stipulation on July 9, 2012, in which it was agreed that all counts against the City of Philadelphia would be dropped and that the City would be dismissed as a defendant in the instant action.  As such, the Court need not opine on Anderson's claims against the Defendant officers for actions taken in their official capacities any further here.

> The approving silence emanating from the officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows.  Such silence is an endorsement of the constitutional violation resulting from the illegal use of force.  It is incompatible with the restrictions imposed under the Eighth Amendment, and is therefore unacceptable.  We will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it.

Id. at 651 (internal footnote omitted).  The Court of Appeals was cautious, however, to cabin the holding of Mensinger by recognizing that an officer can only be held individually liable if he had a "realistic and reasonable opportunity" to intervene in the misconduct.  Id. (internal citations omitted).

In the instant case, Defendants concede that, if Officer Hoover did in fact use excessive force upon Anderson, then the remaining officers at the scene would have had a duty to intervene under the law.  (Defs.' Mot. Summ. J. at 16 ("Assuming for the purposes of this motion that Defendant Hoover violated Plaintiff's right to be free from excessive force[,] . . . each of the named officers had a duty to intervene to stop that violation.").)  Defendants argue, however, that Anderson's claims against the remaining officers fail because they did not have a realistic and reasonable opportunity to intervene in Hoover's alleged misconduct.  (Id.)  More specifically, Defendants aver that Anderson cannot place any of the other police officers at the scene of the alleged assault.  In support of this argument, they rely on the fact that all the officers testified in their depositions that they did not witness any excessive force being used upon Anderson.  (Id. at 17.)  Based on this evidence—or lack thereof—Defendants contend that they are entitled to summary judgment on Plaintiff's excessive force claim.

The Court, however, does not agree.  Contrary to Defendants' assertions that "Plaintiff has adduced no competent evidence that any of the officers listed above were present at the scene of the

19

assault," (see id.), the Court finds numerous instances in the record that directly contradict this statement.  For example, in his deposition, Officer Lackey acknowledged that both he and his partner, Officer Fuentez, were present at the scene of Anderson's formal arrest.  (Lackey Dep. 50:15–19.)  Similarly, in her deposition, Officer Quiles stated that: "[A]t the same time the two officers were chasing, . . . Officer Lackey comes on location, as the young man is cornered, the two cops who were chasing him approached him, as well my partner [Wright] . . . and myself."  (Quiles Dep. 38:7–12.)  Thus, Officer Quiles' testimony indicates that she, Officer Wright, and Officer Lackey were present at the scene of the arrest and alleged abuse.  Moreover, Officer Wright also acknowledged his presence at the scene, and even provided the following recollection of Anderson's arrest at his deposition:

> A:  From what I recall, I remember seeing Officer Hoover and Officer Hazard [sic] standing close to the male that was stopped.  I remember seeing Officer Hoover pick him up, and that's when I saw that he had on dark-clothing, he was a dark-skinned male, because he basically put him against the wall.  He stood him up.  To my right is when I saw Sergeant Connell come in.
>
> . . .
>
> Q:  [Y]ou actually saw Hoover, Hazard [sic], and Connell standing over the male who was apprehended?
>
> A:  Like I said, when I looked over at them, I saw Hoover pick the guy up and Sergeant Connell coming over.  An officer was still trying to ascertain from Lackey, they were just standing there with the male against the wall at that point.
>
> . . .
>
> Q:  And Hoover is the one who picked up my client from the ground?
>
> A:  From what I remember, yes.
>
> . . .
>
> Q:  Tell me [about] yourself and Quiles[.]
>
> A:  . . . [W]e really didn't have any contact with this kid.  We were just basically support personnel going in for backup.

(Wright Dep. 19:17–24, 27:8–18, 28:23–24, 29:1, 35:9–16; see also Wright Statement at 2.)  Thus, according to Officer Wright's testimony, not only were Officers Quiles, Connell, and Lackey present

at the scene, but also were witnesses to Hoover's alleged use of physical force on Anderson.

As such, given the voluminous instances in the record indicating that Officers Fuentez, Lackey, Wright, Quiles, and Connell witnessed Anderson's arrest and physical assault, the Court cannot conclude that these officers did not have a "realistic and reasonable opportunity" to intervene in Hoover's misconduct under these circumstances. Accordingly, the Court is unable to grant summary judgement in Defendants' favor on this point.

### 2.      Failure to Supervise

"'A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.'" Plouffe v. Cevallos, No. Civ.A.10-1502, 2012 WL 1994785, at *4 (E.D. Pa. June 1, 2012) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Even though supervisory officials cannot be held liable under a respondeat superior theory, they can be held liable for actions taken in their individual capacity if: (1) the supervisor participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations; or (2) the supervisor, acting with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused the plaintiff's constitutional harm.  See Plouffe, 2012 WL 1994785, at *4 (citing Santiago v. Warminster Twp., 629 F.2d 121, 129 n.5 (3d Cir. 2010)); Gaymon v. Esposito, No. Civ.A.11-4170, 2012 WL 1068750, at *4 (D.N.J. March 29, 2012) (citing A.M. ex rel. J.M.K. v. Luzerne Cnty. Juevenile Pet. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)). Furthermore, in order to prevail on a failure to supervise claim, a plaintiff must establish "a causal connection between the supervisor's direction and th[e] [constitutional] violation, or, in other words, proximate causation." Gaymon, 2012 WL 1068750, at *4 (internal citation omitted).  Proximate

21

cause under such circumstances is established when the supervisor gave directions that he knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights. Id. (internal citation omitted).

Here, Plaintiff avers that Officer Connell can be held individually liable because, as the supervising officer in charge, he failed to prevent or stop Officer Hoover's alleged use of excessive force upon Anderson. (Pl.'s Resp. Opp'n 4–6.) In response, Defendants assert that Plaintiff cannot prevail on his failure to supervise claim against Officer Connell because he was not present during the alleged use of physical force, but rather arrived on the scene after Anderson was already handcuffed and placed in the back of the police vehicle. (Defs.' Mot. Summ. J. 18.) According to Defendants, Officer Connell therefore could not have participated in the alleged violation of Anderson's constitutional rights, or had knowledge of and acquiesced in Officer Hoover's alleged use of excessive force, such that he could be held liable under these circumstances.

The record, however, indicates that genuine issues of material fact remain as to whether or not Officer Connell participated in, directed, or, acquiesced in his subordinates' violations of Anderson's constitutional rights through the use of excessive force. As an initial matter, the Court notes that Officer Connell contradicts himself several times throughout the record. For example, Officer Connell was called to give a sworn statement about Anderson's alleged assault to an IAD investigator after Anderson filed a formal complaint with IAD. (Defs.' Mot. Summ. J., Ex. B1, Statement of Sgt. James Connell ("Connell Statement") at 1–2.) During the investigation, Officer Connell told the investigator that he had absolutely no recollection of Anderson or the incident. (Id.) Several months later, Officer Connell had his deposition taken in preparation for the instant litigation, at which time he was again asked about the incident in question. Contrary to his prior

statements at the IAD investigation, Officer Connell definitively responded that he did in fact recall

the incident. (Connell Dep. 36:23–24, 37:1–2.) Also during his deposition, Officer Connell initially

testified that he was never present at the scene of Anderson's alleged assault and formal arrest, and

only came into contact with him upon his arrival at the police station. (Id. at 37:5–21.) A short time

later in his deposition, however, Officer Connell acknowledged being present at the scene, stating

that:

> I remember that I was working inside the building.  I don't remember ever actually
> going out on the street that day. . . . I could have been inside just doing paperwork,
> getting caught up on paperwork, or something along those lines, but I don't recall
> ever leaving the building, *except to walk up the street to where the foot pursuit
> ended*.  And by the time I got there everything was done.  The prisoner was in the
> wagon, I walked back to headquarters.

(Id. at 38:3–12) (emphasis added).  Such discrepancies in his testimony call into question Officer

Connell's potential liability regarding Anderson's alleged assault.  If Connell was not present during

the alleged incident, then one would be strained to hold him responsible for Officer Hoover's alleged

misconduct.  On the other hand, if he was in fact present at the scene "where the foot pursuit ended"

as he testified, then it is plausible that he witnessed—and therefore failed to stop—Officer Hoover's

constitutional violations in his capacity as a supervisor.  Given Officer Connell's own litany of

testimonial discrepancies, the Court finds that genuine issues of material fact remain regarding

Officer Connell's role in the alleged use of excessive force, thereby making summary judgment on

this claim inappropriate at this time.

Moreover, aside from Officer Connell's own contradictions, the record also indicates that the

statements of Anderson and several other officers directly contradict the crux of Defendants'

argument that Connell was not present at the scene of Plaintiff's alleged assault.  For example, at

their depositions, Officers Lackey and Quiles recalled Connell's presence at the scene. (Lackey Dep.

23

49:21; Quiles Dep. 43:6–9, 44:5–16.)  On his part, Anderson testified that a police officer in a white

shirt[9] matching Connell's description potentially partook in his alleged assault.  (Anderson Dep.

76:12–22.)  Officer Wright corroborated Anderson's statement at his own deposition:

> Q:   [Were] [a]ny white shirts there beyond Sergeant Connell?
> A:   No; just him.

(Wright Dep. 18:13–15.)  In fact, during both his deposition and IAD investigation, Officer Wright

not only identified Officer Connell as being present at the scene, but also recalled him standing over

Anderson with Officers Hoover and Hazzard during the alleged assault.  (Id. at 19:17–24, 27:8–24,

28:15–24; Wright Statement at 2 ("I saw Sgt. Connell and P/O Hoover and P/O Hazard [*sic*]

standing over the male.").)

   As such, a reasonable factfinder here could find that Officer Connell may have participated

in, directed, or, acquiesced in his subordinates' violations of Anderson's constitutional rights.  In

fact, Anderson testified that the other officers alongside Hoover during the assault instructed Hoover

to "put him down." (Anderson Dep. 65:9–24.)  If Officer Connell was in fact present at the scene,

then such a statement could certainly be interpreted by jury as a direction to use physical force upon

Anderson.  At a minimum, Officer Connell's presence during the incident and failure to stop the

alleged assault could certainly be interpreted as an acquiescence or participation in Officer Hoover's

misconduct.  Such significant factual discrepancies surrounding Officer Connell's presence at the

alleged assault constitute genuine issues of material fact.  Accordingly, Defendants' request for

summary judgment on the grounds that Officer Connell cannot be held liable under a failure to

---

[9] Supervising officers in the Philadelphia Police Department wear white shirts, while their subordinate officers wear blue shirts.

24

supervise theory is denied.[10]

## IV.    CONCLUSION

For the aforementioned reasons, Defendants are not entitled to qualified immunity on Plaintiff's false arrest claim.  Defendants likewise have not established that no genuine issues of material fact remain regarding Plaintiff's excessive force claim.  Accordingly, Defendants' Motion for Summary Judgment is denied in its entirety.

An appropriate Order follows.

---

[10] Given that the Court finds that a reasonable jury here could find that Officer Connell participated in, directed others to, or acquiesced in his subordinates' violations of Anderson's constitutional rights, the Court need not consider whether Connell could likewise be held individually liable under the second theory of supervisor liability, *i.e.*, whether, acting with deliberate indifference to the consequences, Officer Connell established and maintained a policy, practice, or custom which directly caused Anderson's constitutional harm.